UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**RAMON ALVARADO, JR.,**

       **Plaintiff,**

v.                                                        **Case No. 22-1357**

**JOHN BIRDYSHAW,** *et al.*,

       **Defendants.**

---

### DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Ramon Alvarado, Jr., who is incarcerated and representing himself, brings this lawsuit under 42 U.S.C. § 1983. Alvarado was allowed to proceed on an excessive force claim against defendants John Birdyshaw, Lt. David Dingman, and Warden Brian Foster for allegedly using excessive force on him during a cell extraction and subsequent strip search. He was also allowed to proceed on a claim against defendants Dingman, John Bretzel, Jesse Jones, Andrew Lehman, Andrew Miller, Thomas Nelson, and Brandon Fischer for failing to intervene and prevent the use of excessive force. Alvarado additionally was allowed to proceed on a First Amendment retaliation claim against Birdyshaw, Bretzel, Dingman, Fisher, Jones, Lehman, Miller, and Nelson, because he alleged they allowed him to be subjected to excessive force in retaliation for filing lawsuits against the Wisconsin Department of Corrections and Waupun Staff. The Court also took supplemental jurisdiction over Alvarado's state law claims for intentional infliction of emotional distress and battery.

The defendants move for summary judgment on Alvarado's claims against them. (Docket # 39.) Alvarado has responded in opposition. For the reasons stated below, the defendants' motion for summary judgment is granted.

**FACTS**

1.  *Events at the Strip Cell*

At all times relevant, Alvarado was incarcerated at Waupun Correctional Institution. (Docket # 41, ¶ 1.) On January 10, 2020, Alvarado was housed in the Restrictive Housing Unit (RHU). (*Id.*, ¶ 6.) At some point, defendant Dingman was called to Alvarado's cell. (*Id.*, ¶ 7.) Staff told Dingman that Alvarado stated that he was going to harm himself with a staple. (*Id.*, ¶ 8.) Dingman ordered Alvarado to place his hands out of the cell trap door in order to be restrained. (*Id.*, ¶ 12.) Alvarado initially refused to comply, so Dingman told Alvarado he had a taser and that he would use it if Alvarado did not comply. (*Id.*) Alvarado then positioned himself to be restrained and was moved to strip cell #3 without incident. (*Id.*, ¶ 13.)

Once Alvarado was secured in the strip cell, the defendants state Alvarado talked with defendant Fisher and told him "he was not suicidal and had only said that so Fisher would report to his cell. Alvarado wanted to speak about legal work that he wanted help filling out." (Docket # 41, ¶ 14.) Alvarado does not dispute that he told the officers he was not suicidal, but he states that he lied to them about self-harming because he wanted a pen to use to do legal work. (Docket # 63 at 1.) Then, according to Alvarado, Birdyshaw asked what was going on with him, and Alvarado told the officers that he was placed back on administrative confinement and needed a pen. (Docket # 62, ¶¶ 1–2.) Alvarado discussed his legal work first with Fisher and then with Birdyshaw, Dingman, and Nelson, including how he was filing a post-conviction motion in his criminal case and the lawsuit he filed against Waupun staff.

2

(*Id.*, ¶¶ 2–4.) Alvarado states that Birdyshaw, Dingman, and Nelson told him "they were going to beat my ass for filing that lawsuit and lying about being suicidal." (*Id.*, ¶ 6.) Alvarado responded, "you punk motherfuckers ain't going to do shit to me, fuck you bitches." (*Id.*, ¶ 7.)

Dingman then called Psychological Services and told them what happened. (Docket # 41, ¶ 15.) Psychological Services determined that Alvarado needed to be placed on observation status. (*Id.*) Birdyshaw and Nelson told Alvarado he would be placed on observation status and asked if he would comply with a strip search. (*Id.*, ¶ 16.) Alvarado initially told them he would comply, but once Birdyshaw and Nelson removed his leg restraints to conduct the strip search, Alvarado refused to comply because he did not want to go into observation status. (*Id.*, ¶ 17.)

Alvarado states that once Birdyshaw told him he was going into observation status, he began using his glasses to cut himself. (Docket # 62, ¶ 8.) Dingman, who had been seeking permission from Warden Foster to assemble a pad subduing team to escort Alvarado into observation status, returned to Alvarado's cell. Birdyshaw then told Dingman that Alvarado was cutting himself with his glasses. (Docket # 41, ¶¶ 19–20.) It is undisputed that Dingman then ordered Alvarado to give the glasses to Dingman. (*Id.*, ¶ 20.; Docket # 62, ¶¶ 9–10.) Alvarado asserts that Dingman did not order him to stop cutting himself. (Docket # 62, ¶ 11.) Alvarado also asserts that once Dingman asked for his glasses, he wrapped the glasses up in his shirt and gave his shirt to Birdyshaw. (*Id.*, ¶ 12.)

The defendants assert that Dingman gave Alvarado several directives to stop cutting himself, and Alvarado ignored them. (Docket # 42, ¶¶ 21–22.) Because Alvarado was not obeying the directives to stop harming himself, Dingman "based on his judgment and training

3

. . . determined it was appropriate to use the taser to prevent Alvarado from further harming himself." (*Id.*, ¶ 22.) Dingman withdrew the taser and gave Alvarado another chance to comply with his order to stop cutting himself. (*Id.*, ¶ 23.) Alvarado did not comply and attempted to cover his cell trap with a t-shirt. (*Id.*) At that point, Dingman deployed the taser at Alvarado's right leg, but it did not properly latch on to Alvarado and Dingman was able to remove it. (*Id.*, ¶ 24.) Dingman then reloaded the taser and again ordered Alvarado to comply with his orders. (*Id.*, ¶ 25.) Alvarado refused, so Dingman deployed the taser again, this time at Alvarado's left leg. (*Id.*, ¶ 26.) The taser again did not properly latch, but it caused Alvarado to drop the glasses. (*Id.*)

Alvarado disputes the defendants' version of events and states that he complied with Dingman's order to give him the glasses right away. (Docket # 62, ¶¶ 12–13.) He also asserts that he did not attempt to cover the cell trap door with his shirt, but instead the shirt got stuck on the cell trap door and the tether attaching Alvarado to the door. (*Id.*) Alvarado states that Dingman then ordered Alvarado to give him the shirt, or he was going to shoot him with a taser. (*Id.*, ¶ 14.) Alvarado responded that he gave Birdyshaw the shirt, but it got stuck on the trap door. (*Id.*, ¶ 15.) He also states that the taser did properly attach, but he "became prideful and yelled out to Dingman, 'you didn't do shit to me, you bitch!'" (*Id.*, ¶¶ 16–17.) Dingman again told Alvarado to release the shirt, and Alvarado told him the shirt was stuck to the door. (*Id.*, ¶ 18.) Alvarado states that Dingman then shot him a second time with the taser while Birdyshaw and Fisher tried to dislodge the shirt from the trap door. (*Id.*, ¶ 19.)

Alvarado also states that the surveillance video submitted in evidence (Docket # 50-2) shows that when he gave Birdyshaw the shirt, the glasses fall out of the shirt and Nelson

4

kicks them so they move off to Nelson's right side. (*Id.*, ¶¶ 20–21.) Then Dingman picks up the glasses and spent taser cartridge case and places them on a nearby shelf. (*Id.*, ¶ 23.)

    2.    *Cell Extraction and Strip Search*

After Dingman deployed the taser, the defendants state that Alvarado still was noncompliant with Dingman's orders and began threatening staff members. (Docket # 41, ¶ 30.) Dingman decided to use the pad subduing team to extract Alvarado from his cell. (*Id.*, ¶ 31.) Defendants Birdyshaw, Lehman, Bretzel, and Miller made up the pad subduing team while defendant Jones video recorded the extraction. (*Id.*) The cell door was opened, and the pad subduing team entered. (*Id.*, ¶ 33.) Alvarado states that Birdyshaw "grabbed me, he pushed me roughly up against the door frame and strip cage door causing my left cheek to smack or hit the door frame and strip cage door and I received an abrasion or bruise to the cheek." (Docket # 62, ¶ 27.) Birdyshaw also kneed Alvarado's left leg to the wall. (*Id.*, ¶ 28.) Alvarado states that the officers bent his left wrist, causing numbness in his hand. (*Id.*, ¶ 29.) The defendants assert that they used the pads to "direct Alvarado to the wall" to "secure his hands behind his back." (Docket # 41, ¶ 33.) They intentionally held Alvarado firmly against the wall to ensure the safety of Alvarado and the staff. (*Id.*, ¶ 34.) All the while, the officers directed Alvarado to stop resisting. (*Id.*, ¶ 36.) Once Alvarado was secured, the pad subduing team conducted a staff-assisted strip search to ensure Alvarado did not have any contraband on his person. (*Id.*, ¶ 41.) Birdyshaw narrated the search, and once it was complete, had Alvarado cover up with a privacy wrap. (*Id.*) Alvarado was then briefly examined by non-defendant Nurse Kacyon, who examined Alvarado's wrist at Alvarado's request because he cut himself there with his glasses. (*Id.,* ¶ 45.) Nurse Kacyon also told Alvarado that his wrist

5

was hurting because he was placed in a compliance hold. (Docket # 62, ¶ 29.) Alvarado was then escorted into observation status without any further incident. (*Id.*, ¶ 46.)

       3.    *Warden Foster's Involvement*

Alvarado asserts that Warden Foster ordered Dingman to use the taser in addition to permitting the pad subduing team to extract Alvarado from the strip cell. (Docket # 62, ¶ 42.) The defendants state that Warden Foster approved the pad subduing team but was not involved with the decision to deploy the taser. (Docket # 41, ¶¶ 55–59.)

       4.    *The Videos*

There are two videos that depict some of the events of January 10, 2020. First, there is a surveillance video, which does not have audio. (Docket # 50-2.)[1] It shows Dingman's deployment of the taser. Alvarado is not within the camera's view. The video begins with Dingman and three other officers calmly approaching Alvarado's cell. Dingman has a taser in his hand and addresses Alvarado while pointing to the cell trap door. One of the officers reaches into the trap door and grabs Alvarado's shirt. The officer shakes the shirt several times, but nothing (including any glasses or glass pieces) falls out of the shirt. The shirt appears stuck on the tether. Dingman approaches the cell and talks to Alvarado. He loads his taser and fires, but the taser strings are clearly not attached to anything, suggesting that they did not hit Alvarado. Dingman then drops the spent taser charger. Dingman is handed a different taser and fires again after a short discussion with Alvarado. Again, the taser strings do not appear to be attached to anything. The pad subduing team assembles, and Dingman reaches

---

[1] The Court notes that the defendants' citations to the surveillance video in their materials in support of their motion for summary judgment appear to be to Exhibit 1000 at a time stamp of approximately 21:00. The way the videos were submitted to the court, there were two videos approximately 9 minutes in length each. The defendants' citations are therefore incorrect, and the court uses the docket number of each video.

6

down to pick up the spent taser cartridges. The video does not show any glasses or glasses pieces on the floor. The remainder of the video is another angle of the cell extraction. Because the Court has a better angle with the second video of the cell extraction (see below), the Court will use that version for its analysis.

The second video is the video that defendant Jones recorded during the cell extraction and strip search. (Docket # 50-1.) This video, which is approximately nine minutes long, has audio, and provides a clear picture of both the pad subduing team and Alvarado. The video largely confirms the defendants' version of events. Dingman is calm and professional as the recording starts, explaining what is occurring in a perfunctory manner. Once the cell door is opened, Alvarado makes a slight move towards the door. As a result, Birdyshaw and the other officers use some force to restrain him. Birdyshaw presses Alvarado up against the door, using his body to subdue and restrain Alvarado. Alvarado repeatedly yells "excessive force" and fidgets while the officers restrain him. He also complains that Birdyshaw is bending his wrist, and Birdyshaw responds that he is not. Alvarado is clearly angry and agitated throughout the encounter.

The video also shows the strip search and the nurse's examination, which confirms the defendants' version of those events. At the end of the video, Dingman debriefs the pad subduing team. Dingman explains why he used the taser—because Alvarado was self-harming—and then explains why the cell extraction was necessary. Dingman is calm and professional through the debriefing.

**SUMMARY JUDGMENT STANDARD**

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Alvarado claims that Dingman and Warden Foster used excessive force when they decided to taser him. He also claims that Birdyshaw used excessive force when he was subduing him during the cell extraction. He further claims that defendants Dingman, Bretzel, Jones, Lehman, Miller, Nelson, and Fischer for failed to intervene and prevent Birdyshaw's use of excessive force. Alvarado additionally claims that Birdyshaw, Bretzel, Dingman, Fisher, Jones, Lehman, Miller, and Nelson, retaliated against him by either engaging in excessive force against him or allowing excessive force to be used against him because he filed lawsuits against the Wisconsin Department of Corrections and Waupun Staff.

1. *Eighth Amendment Excessive Force Claim for Use of Taser*

Correctional officers violate the Eighth Amendment when they use force "'maliciously and sadistically for the very purpose of causing harm,' but not when they apply it in good faith to maintain or restore discipline." *Jackson v. Angus*, 808 Fed. Appx. 378, 382 (7th Cir. 2020) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). "Several factors are relevant in determining whether a defendant applied force in good faith or for purposes of causing harm, including the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of the injury caused by the force." *Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009).

Dingman asserts that he used the taser because Alvarado was cutting himself with his glasses and ignored his directives to stop self-harming. Alvarado argues that Dingman never told him to stop cutting himself, but he did tell him to hand over his glasses. Alvarado also asserts that he complied with Dingman's order by handing over the glasses, which he wrapped in his shirt. Then, the shirt got caught on the cell trap door and his tether. Dingman kept

9

ordering Alvarado to give him his shirt, but he couldn't because it was stuck. Thus, Dingman needlessly tased him, and both times the taser made good contact.

The surveillance video of the encounter does not match up with Alvarado's story. While the video does show that the shirt is stuck in the door, it is clear that the glasses were not wrapped up in the shirt. Contrary to Alvarado's assertions, the video does not show an officer kicking the glasses towards the wall. The video shows Dingman kicking discarded used taser chargers on to the floor and then later picking them up. "Where opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 327, 376 (2007).

Alvarado also argues that the use of the taser was excessive because at the moment the taser was deployed, he was not actively self-harming. But the Court must consider the situation in the light of several factors including whether the threat was reasonably perceived by Dingman, and the injury caused by the use of the taser. It is undisputed that Alvarado was self-harming, he was angry and agitated, and that he was not complying with orders to allow a strip search and move to observation status. The Seventh Circuit Court of Appeals has held that where a prisoner is being noncompliant, unruly, and confrontational, using a taser to subdue the prisoner is justified. *See Lewis*, 581 F.3d at 477. Thus, Dingman reasonably perceived a safety threat both to Alvarado himself and to prison staff.

Also, there is nothing in the record to indicate that Alvarado suffered any injury as a result of the taser. The defendants assert, and the video confirms, that both times the taser did not attach to Alvarado. Alvarado argues that Dingman should have first used a lesser

10

incapacitating agent, like pepper spray, to attempt to gain compliance, and the fact that he did not do so violates DOC policy. Policy violations, however, do not amount to constitutional violations. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)) ("Section 1983 protects against 'constitutional violations, not violations of . . . departmental regulation and . . . practices[.]'"). Additionally, Alvarado argues that Dingman (as well as Birdyshaw and Nelson) threatened to beat him up just prior to using force, which proves that he used the taser maliciously. Alvarado's characterization of these defendants' actions, however, is inconsistent with the behavior demonstrated in the videos—calm, professional, and perfunctory. Without other evidence, no reasonable factfinder could conclude that off camera, these defendants were acting completely differently than they appear on-camera. *See Boyd v. Pollard*, 621 Fed. App'x 352, 356 (7th Cir. 2015). In short, when considering all the relevant factors, no reasonable jury could conclude that Dingman used excessive force when deploying the taser.

While there is a question of fact as to whether Warden Foster ordered Dingman to use the taser, the question is immaterial. Because the Court finds that Dingman did not use excessive force, even assuming Warden Foster did order Dingman to tase Alvarado, such an order does not amount to a constitutional violation. Summary judgment is granted in Dingman's and Warden Foster's favor on the Eighth Amendment excessive force claims against them.

    2.    *Eighth Amendment Excessive Force Claim Against Birdyshaw*

Alvarado argues that Birdyshaw used excessive force against him when restraining him as part of the pad-subduing team because he slammed his head into the door, kneed him in the leg, and bent his wrist back. Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The force used by a prison official must be "of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9–10 (citations omitted). The video clearly shows that Birdyshaw roughly handled Alvarado, but the video also confirms that Alvarado was noncompliant, angry, agitated, and a security risk. "Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority (that's how the prisoners came to be there, after all) is to be manageable." *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012). There is nothing on the record to suggest that Birdyshaw's actions were repugnant to the conscience of humankind. Instead, the video shows that Birdyshaw's actions were a "good faith effort to maintain or restore discipline." *Id.* As discussed above, Alvarado's assertion that Birdyshaw had threatened to beat him up earlier is not credible proof of maliciousness. Summary judgment is granted in favor of Birdyshaw on the excessive force claim.

    3.    *Failure to Intervene Claim*

Because the Court finds in Birdyshaw's, Dingman's, and Warden Foster's favor on the excessive force claims, the Court also finds in defendants' favor on the failure to intervene claim. "In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). The Court grants summary judgment in the defendants' favor on the failure to intervene claim.

    4.    *First Amendment Retaliation Claim*

12

To state a retaliation claim, a plaintiff must allege that "(1) [the plaintiff] engaged in an activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). The defendants concede that Alvarado engaged in protected conduct.

However, Alvarado does not demonstrate that he suffered a deprivation likely to deter his activity. The Court has determined that the forced used on Alvarado was used to maintain and restore discipline and for a penological purpose. Thus, it cannot also be a deprivation.

Even if Alvarado had made the *prima facie* showing of retaliation, he cannot overcome the defendants' showing that the actions would have occurred anyway. *See Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013). No reasonable jury could conclude that the defendants would not have tasered and subdued him if Alvarado had not sued the DOC and Waupun staff. The videos make clear that Alvarado was noncompliant, unruly, agitated, and angry. It is also undisputed that he was cutting himself with his glasses. Summary judgment is granted on the First Amendment retaliation claim.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. At screening, the Court exercised supplemental jurisdiction over Alvarado's intentional infliction of emotional distress and battery claims under Wisconsin state law. Now that the Court has granted summary judgment in favor of defendants and dismissed the federal claims, the court declines to continue to exercise that jurisdiction. *See* 28 U.S.C. § 1367(c); *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). The defendants also argue that they are entitled to qualified immunity; however, because the Court granted summary judgment in

13

their favor on the merits, it need not address the qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 39) is **GRANTED.**

**IT IS FURTHER ORDERED** that the case is **DISMISSED** The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 12th day of July, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge